IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>Miguel Carrera, et al.,<br><br>Defendants. | **REPORT AND RECOMMENDATION**<br><br><br><br><br>Case No. 2:05-CR-895 DAK |

Upon motion of several defendants in this case, the court held a *James* hearing on May 3, 2007, regarding the admissibility of alleged co-conspirators' statements. *See United States v. James*, 590 F.2d 575 (5th Cir.), *cert. denied*, 442 U.S. 917 (1979). In addition to allowing evidence to be presented at the hearing, the court gave defendants' counsel an opportunity to present oral argument. The court received memoranda from two defendants and the government following the *James* hearing.

Having reviewed the parties' pleadings, and having held the *James* hearing, the court enters this report and recommendation.

## BACKGROUND

Several defendants in this case, including Eric Angell and Francisco Valencia, filed motions requesting a *James* hearing. (Docket Entries #329, 332, 333, 335, 408.) The defendants'

motions were granted, and on May 3, 2007, the court held a *James* hearing.  (Docket Entry #553; Official Transcript of May 3, 2007 *James* Motion Hearing (hereafter referred to as "Tr. __").)   The court ordered that all defendants who had not entered guilty pleas be present at the hearing.  As a result, Defendants Mark Robles, Francisco Valencia, Javier Segura, Miguel Carrera,[1] Jeffrey Thiemig, and Christopher Duell attended the hearing.  Defendant Eric Angell did not attend the hearing, but his attorney was present and waived Defendant Angell's appearance.  All of the defendants had counsel present except for Defendant Theimig.[2]

Subsequently, on May 16, 2007, two defendants, Francisco Valencia and Christopher Duell, each filed a memorandum regarding the *James* analysis.  (Docket Entries #529, 532.)   The government filed its response to those memoranda on May 22, 2007.  (Docket Entry #535.)   None of the other defendants involved in the *James* hearing filed a memorandum regarding the *James* hearing and Rule 801(d)(2)(E) analysis, nor did any of those defendants file a

---

[1]Defendant Carrera and his counsel left the courtroom at the beginning of the hearing at the request of his counsel because Defendant Carrera planned to enter a plea of guilty.  Therefore, Defendant Carrera and his attorney did not participate in the evidentiary aspect of the *James* hearing.

[2]Defendant Theimig's current counsel was not appointed to represent Defendant Theimig until April 17, 2007.  (Docket Entry #475.)  As a result, the court is allowing Defendant Theimig's current counsel time to review the extensive materials in this case and to file his motions by August 10, 2007.  (Docket Entry #576.)

notice that they were joining in the memoranda submitted by Defendants Valencia and Duell.  As a result, the court examines only Valencia, Duell, and the government's arguments contained in the memoranda submitted to the court in determining whether the alleged co-conspirators' statements should be admissible.

**ANALYSIS**

Under Rule 801(d)(2)(E) of the Federal Rules of Evidence, a "statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Before admitting evidence under Rule 801(d)(2)(E), the court must determine that three elements have been met.  First, "by a preponderance of the evidence, a conspiracy existed, [second] the declarant and the defendant were both members of the conspiracy, and [third] the statements were made in the course of and in furtherance of the conspiracy." *United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir.), *cert. denied,* 513 U.S. 977 (1994); *see also United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995). One of the ways a district court may make these determinations is by holding a *James* hearing outside the presence of a jury.  *See Urena*, 27 F.3d at 1491.

As discussed above, because the government seeks to admit coconspirator statements under Rule 801(d)(2)(E), this court held a *James* hearing on May 3, 2007.  At the hearing, counsel and the court agreed that the court, at this stage, would focus on the

3

first two of the three elements of Rule 801(d)(2)(E).  Therefore, in this report and recommendation, the court will determine whether (1) a single conspiracy existed and (2) whether the declarant and the defendants still involved in this case were members of the conspiracy.  The third element, whether the statements were made in the course of and in furtherance of the conspiracy, will need to be addressed at trial.  Thus, the court addresses the first two elements of Rule 801(d)(2)(E) below.

The court confines its determinations to Defendants Angell, Robles, Duell, Valencia, and Segura because these five defendants were the only defendants who participated in and were represented by counsel at the *James* hearing.  The court does not make a ruling as to Defendant Theimig because Theimig's attorney did not attend the *James* hearing, prompting the court to stop the government from questioning Agent Crosby about specific instances involving Theimig.  (Tr. 42.)  Also, the court does not focus on Defendant Carrera's involvement because Carrera and his attorney left the courtroom before the evidentiary part of the *James* hearing began.  (Tr. 7-8.)

## A.  Whether A Single Conspiracy Existed

In their memoranda, both Defendants Valencia and Duell challenge whether the government has proven that a single conspiracy existed in this case.  Both Defendant Valencia and Defendant Duell argue that the government has set forth evidence showing that two distinct conspiracies, rather than one, existed.

Before addressing Defendants' arguments, the court first examines whether the government has set forth adequate evidence to show that a conspiracy existed.  As both the government and Defendant Valencia point out in their memoranda, to prove a conspiracy, the government must show "'[1] that two or more persons agreed to violate the law, [2] that the defendant knew at least the essential objectives of the conspiracy, . . . [3] that the defendant knowingly and voluntarily became a part of it,' and [4] that the alleged coconspirators were interdependent." *United States v. Evans*, 970 F.2d 663, 668 (10th Cir. 1992) (internal quotations omitted).  The defendants' agreement to violate the law – in this case, to distribute methamphetamine - can be inferred from the defendants' acts.  *See id.* 970 F.2d at 669 n.9; *United States v. Peveto*, 881 F.2d 844, 856 (10th Cir. 1989).

Applying the four elements of a conspiracy to the evidence presented by the government at the *James* hearing, the court concludes that the government has established by a preponderance of the evidence that a conspiracy existed among the defendants who remain in this case.  DEA Special Agent David Crosby testified that the defendants were involved in a conspiracy to distribute methamphetamine from sometime before March 1, 2005, to November 13, 2005, when Defendant Carrera was shot.  (Tr. 11-54.) Agent Crosby testified that several people agreed to violate the law by participating in the distribution of methamphetamine. (Tr. 53.)  Specifically, Agent Crosby testified as to the roles

Defendants Robles, Angell, Duell, Valencia, and Segura, as well
as Carrera, Theimig, Nunley, Morfin, Medina, Marvidikis,
Martinez, Gaona, Housekeeper, Espitia, Duarte, Beauchaine, Lowry,
and Padilla, among others, had in the distribution conspiracy.
(Tr. 35-54.)  Agent Crosby testified that these individuals had
various roles in the conspiracy, such as suppliers, Defendant
Carrera's employees, or customers, or as in the case of Defendant
Lowry, as a customer of Defendant Valencia.  (Tr. 35-54.)

In addition, Agent Crosby's testimony established by a
preponderance of the evidence that each of the five defendants at
issue here knew at least the essential objective of the
conspiracy, which was to distribute methamphetamine.  In
examining the roles of Defendants Angell, Robles, Duell,
Valencia, and Segura, which are currently at issue, Agent
Crosby's testimony sets forth information regarding each of their
roles to adequately establish that each of these defendants knew
that he was participating in a conspiracy to distribute
methamphetamine.  According to Agent Crosby's testimony, the
government intercepted phone calls between Angell and Carrera
concerning Angell's acquisition of methamphetamine.  (Tr. 39.)
Further, Agent Crosby testified that Angell himself admitted to
purchasing methamphetamine from Carrera, and that he in turn gave
that methamphetamine to Defendant Robles.  (Tr. 39.)  Angell also
admitted that he had received methamphetamine from both Robles
and Carrera and that he had been involved in the manufacture of

methamphetamine.  (Tr. 39-40.)  According to Agent Crosby, Angell
further admitted that the transactions he conducted with Carrera
on Robles' behalf were for four ounces of methamphetamine apiece,
an amount that is consistent with redistribution, rather than
personal use.  (Tr. 36, 40.)  Agent Crosby testified that Angell
admitted that he received an eight ball or a quarter ounce of
methamphetamine from Carrera and Robles for acting as the
middleman in brokering transactions between Carrera and Robles.
(Tr. 41.)  Agent Crosby testified that Angell also admitted that
he had purchased drugs from Defendant Housekeeper on one or two
occasions before he was introduced to Carrera.  (Tr. 40.)
Angell's behavior, including the manufacture of methamphetamine
and the brokering of transactions between Carrera and Robles,
adequately established that Angell knew he was participating in a
conspiracy to distribute methamphetamine.

     Agent Crosby's testimony also sets forth information to
adequately establish that Defendant Robles knew he was
participating in a conspiracy to distribute methamphetamine.
Agent Crosby testified that Robles was purchasing methamphetamine
from Carrera, with Angell acting as the conduit for the
transactions between Carrera and Robles.  (Tr. 36.)  Agent Crosby
testified that at some point, Robles began conducting
transactions directly with Carrera himself.  (Tr. 36.)  Agent
Crosby testified that Angell admitted that on four occasions he
received four ounces of methamphetamine from Carrera that he then

passed along to Robles.  (Tr. 36.)  Agent Crosby also testified that four ounces of methamphetamine is a quantity consistent with redistribution rather than personal use.  (Tr. 36.)  Agent Crosby testified that Robles also admitted to purchasing methamphetamine from Carrera and corroborated that Angell had been acting as the conduit for the transactions in the beginning, but that Robles later dealt directly with Carrera.  (Tr. 37.)  Agent Crosby testified that Carrera also corroborated Angell and Robles' statements.  (Tr. 37-38.)  According to Agent Crosby, Robles admitted to having done approximately four or five transactions directly with Carrera, and that those deals were between two and four ounces apiece.  (Tr. 38.)  Agent Crosby testified that Robles also admitted that Angell had purchased drugs for Robles from Carrera on four occasions and that those transactions were for approximately four ounces apiece.  (Tr. 38.)  Robles' behavior, involving the purchasing of methamphetamine from Angell, and then directly from Carrera, for quantities that were consistent with redistribution, adequately establishes that Robles knew he was participating in a conspiracy to distribute methamphetamine.

Agent Crosby's testimony also adequately establishes that Defendant Duell knew he was participating in a conspiracy to distribute methamphetamine.  Agent Crosby testified that prior to the initiation of the wiretap in August 2005, the government had seen telephone records with Duell's name on them, indicating that

Carrera was in frequent contact with a telephone subscribed to by Duell. (Tr. 44.) Agent Crosby testified that after the government initiated the wiretap, it learned that Carrera was, in fact, talking with Duell and supplying him with methamphetamine. (Tr. 44.) Agent Crosby testified that the government also learned that Duell was assisting Carrera with cars being registered in his name that were used by Carrera, and that Duell assisted in other ways by actually driving or going with Carrera when Carrera was distributing and acting as a conduit for sales of methamphetamine to someone in Wyoming. (Tr. 45.) Agent Crosby testified that on one specific occasion, on August 27, 2005, intercepted telephone calls revealed that Carrera asked Duell to deliver four ounces of methamphetamine to someone named Burt. (Tr. 45-46.) Agent Crosby testified that Carrera gave Duell the four ounces, but then asked for two of those ounces back because Carrera needed two ounces to distribute to someone else. (Tr. 45-46.) Agent Crosby testified that during the interception starting in October 2005, there were numerous telephone calls between Carrera and Duell, almost on a daily basis. (Tr. 46.) On October 28, 2005, Duell asked Carrera in a telephone call for "a whole one," or one ounce of methamphetamine, for which he was going to pay $600. (Tr. 46.) Agent Crosby testified that on November 2, 2005, a phone call between Carrera and Duell was intercepted in which Duell talked about the delivery of a whole one, and that he had the money for

9

one.  (Tr. 46.)  Agent Crosby testified that surveillance agents
then followed Espitia and saw him meeting with Duell.  (Tr. 46.)
Agent Crosby testified that Espitia worked for Carrera by driving
Carrera places, making deliveries for him, picking up money for
him, and helping package drugs.  (Tr. 46.)  Agent Crosby
testified that after Duell was arrested, he admitted to being
supplied with methamphetamine by Carrera.  (Tr. 47.)  Agent
Crosby testified that Duell admitted that through his
relationship with Carrera, Duell had met several of Carrera's
associates, including Medina, and that he had seen Medina at
Carrera's house on several occasions and thought of Medina as
Carrera's partner.  (Tr. 47.)  Agent Crosby testified that Duell
admitted that on occasions he would drive Carrera to pick up
methamphetamine, and that Duell identified Ignacio Martinez,
among others, as someone who worked for Carrera.  (Tr. 47.)
Duell's behavior, including purchasing methamphetamine,
delivering methamphetamine to someone else at the request of
Carrera, and providing Carrera with cars that Carrera could use
in his drug transactions, adequately establishes that Duell knew
he was participating in a conspiracy to distribute
methamphetamine.

Agent Crosby's testimony also provided sufficient evidence
that Defendant Valencia knew he was participating in a conspiracy
to distribute methamphetamine.  Agent Crosby testified that phone
calls were intercepted between Carrera and Segura regarding

10

requests for quantities of methamphetamine and prices for those
drugs, during which the two referenced a third person known as
Lalo, who the government was able to identify as Valencia.  (Tr.
24, 27-28, 30.)  Agent Crosby testified that the government
collected telephone records for Valencia, and the government saw
a pattern that when Carrera would contact Segura requesting a
quantity of methamphetamine, Segura and Valencia would then have
contact through their telephones.  (Tr. 30, 31-32.)  Agent Crosby
testified that this pattern occurred almost every day during the
wire interception.  (Tr. 31, 49.)  Agent Crosby testified that
Segura was getting his drugs from Valencia, that Valencia would
actually be present at some of the transactions between Carrera
and Segura, or that Segura would direct Carrera to meet with
Valencia to get the drugs directly from Valencia.  (Tr. 50.)
Agent Crosby testified that Valencia and Segura were Carrera's
sole source of methamphetamine from October 28, 2005, to November
13, 2005.  (Tr. 34, 35, 49, 50.)  Agent Crosby testified that
Valencia and Segura continued supplying Marvidikis, one of
Carrera's customers, after Carrera was shot on November 13.  (Tr.
49.)  Agent Crosby testified that Valencia and Carrera's
relationship was based solely on the acquisition and distribution
of methamphetamine.  (Tr. 54.)

Agent Crosby also testified about an incident that occurred
on November 10, 2005, when surveillance was conducted of
Valencia.  (Tr. 33, 52.)  Valencia was followed from his

residence, and surveillance agents then observed Valencia meeting with Scott Lowry.  (Tr. 33.)   The surveillance agents then followed Lowry, stopped Lowry, and seized from Lowry approximately 28 grams of methamphetamine.  (Tr. 33.)   Lowry admitted that he had received the methamphetamine from Valencia just before the police stopped him, that Valencia was his supply source for methamphetamine, that he had been purchasing methamphetamine from Valencia on a daily basis, and that he paid Valencia $600 for one ounce of methamphetamine.  (Tr. 33.)

Thus, Agent Crosby's testimony regarding Valencia adequately establishes that Valencia knew he was participating in a conspiracy to distribute methamphetamine.  Valencia interacted with Segura and Carrera to supply Carrera quantities of drugs that would allow Carrera to redistribute those drugs to other individuals.  Valencia's knowledge that Carrera was redistributing the methamphetamine is further shown by Agent Crosby's testimony that after Carrera was shot, Valencia continued to supply Marvidikis, one of Carrera's customers, with methamphetamine.

In addition, Agent Crosby's testimony adequately establishes that Defendant Segura knew he was participating in a conspiracy to distribute methamphetamine.  Agent Crosby testified that Carrera had a relationship with Segura from October 28, 2005, to November 13, 2005, when Carrera was shot.  (Tr. 23, 34, 49, 60.) Agent Crosby testified that Carrera and Segura's relationship was

based solely on the acquisition and distribution of methamphetamine.  (Tr. 49, 54.)  Agent Crosby testified that when the government reinitiated the interception of Carrera's telephone in late October 2005, they quickly saw a pattern of customers calling Carrera requesting quantities of methamphetamine, then Carrera contacting Segura requesting that same quantity of methamphetamine or additional quantities of methamphetamine.  (Tr. 24-27.)  This pattern continued on an almost daily basis until November 13, 2005, when Carrera was shot.  (Tr. 27, 49.)  As discussed above, Carrera and Segura also would discuss Valencia, who was Segura's supplier of the methamphetamine.  (Tr. 24.)  Also as discussed above, Agent Crosby testified that after Carrera contacted Segura regarding the purchase of a quantity of methamphetamine, Segura would then contact Valencia.  (Tr. 30-32.)  Agent Crosby testified that the person who held the operation together was Segura.  (Tr. 54.)  Thus, Agent Crosby's testimony regarding Segura provided adequate evidence that Segura knew he was participating in a conspiracy to distribute methamphetamine.

Furthermore, Agent Crosby's testimony established by a preponderance of the evidence that each of the five defendants at issue here knowingly and voluntarily became a part of the conspiracy.  As outlined above, Agent Crosby testified regarding the roles those five defendants played in the conspiracy to distribute methamphetamine.  The evidence adequately established

13

that each defendant knew that he was contributing to the conspiracy.  The evidence adequately established that the defendants were providing others with quantities of methamphetamine large enough for redistribution, or were otherwise facilitating methamphetamine transactions.  In addition, no evidence has been presented that any defendant's contribution to the conspiracy was not voluntarily made.

Finally, Agent Crosby's testimony also provided sufficient evidence that the alleged coconspirators were interdependent. Agent Crosby's testimony described a network of individuals who were each needed to perform a function to accomplish the common goal of methamphetamine distribution.  For example, Agent Crosby's testimony revealed that Defendants Valencia and Segura were selling a large quantity of methamphetamine to Carrera because Carrera would buy it and then resell it to other defendants, such as Duell, Robles, and Marvidikis,, who would buy it, and sometimes had even requested a certain quantity of methamphetamine from Carrera before he bought it from Valencia and Segura.  Thus, the defendants were mutually interdependent on the others to make the whole methamphetamine distribution operate in the way that it did.

In conclusion, Agent Crosby's testimony established by a preponderance of the evidence each of the elements necessary to show that Defendants were involved in a conspiracy to distribute methamphetamine.  As outlined above, Agent Crosby's testimony

14

described how Defendants agreed to violate the law, set forth
that Defendants knew at least the conspiracy's essential
objective to distribute methamphetamine, set forth that
Defendants knowingly and voluntarily became a part of the
conspiracy to distribute methamphetamine, and described a network
in which Defendants and others were interdependent on each other
to make the whole methamphetamine distribution operate in the way
that it did.

The court next addresses the argument raised by Defendants
Valencia and Duell that Agent Crosby's testimony established that
there was not one single conspiracy, but rather that at least two
distinct conspiracies existed in this case.  Valencia argues that
Carrera effectively ended the prior conspiracy he had involving
Morphin and Medina, his prior methamphetamine suppliers, in
August 2005, and he did not begin the alleged conspiracy with
Valencia until November 1, 2005.  Valencia argues that no
evidence has been shown that he knew of the prior conspiracy,
that he intended to join it, or that he was interdependent with
the members of the prior conspiracy.  Similarly, Defendant Duell
argues that Agent Crosby's testimony revealed that the
Morphin/Medina network was separate from the Valencia/Segura
network, and therefore two separate conspiracies were discussed
in Agent Crosby's testimony.

The Tenth Circuit has explained:

> "To find a single conspiracy, the jury must
> be convinced beyond a reasonable doubt that
> the alleged coconspirators possessed a
> common, illicit goal.  Proof of separate
> transactions does not necessarily establish
> multiple conspiracies.  Rather, it must be
> determined whether such activities
> constituted essential and integral steps
> toward the realization of a common, illicit
> goal."

*Owens*, 70 F.3d at 1126 (citation omitted).  "'[L]apses of time,

changes in membership, or shifting emphases in the locale of

operations [do not] necessarily convert a single conspiracy into

multiple conspiracies.'"  *United States v. Roberts*, 14 F.3d 502,

511 (10th Cir. 1993) (citation omitted).  Although the occurrence

of separate transactions is a factor to consider, whether the

activities of several individuals constituted essential and

integral steps toward the realization of a common, illicit goal

is the ultimate question.  *See Owens*, 70 F.3d at 1126.  It is not

necessary that each member of the conspiracy know each other

member, so long as each is working toward a common goal.  *United

States v. Gonzalez*, 940 F.2d 1413, 1422 (11th Cir. 1991), *cert.

denied*, 502 U.S. 1047 and 1103 (1992).  Further, "[a] single

conspiracy may be found where there is a 'key man' who directs

the illegal activities, while various combinations of other

people exert individual efforts towards the common goal."  *Id.*

In this case, Agent Crosby's testimony was that initially

the primary source for Carrera's drugs was Medina, who was

getting his drugs from Morfin in California.  (Tr. 48.)  Agent

16

Crosby testified that Morfin's relationship with Medina soured
because Medina failed to pay a drug debt; but before that
occurred, Morfin had been introduced to Carrera.  (Tr. 48.)
Agent Crosby testified that because Morfin viewed Carrera and
Medina as somewhat of a partnership, Morfin then put that drug
debt on Carrera, who eventually tried to pay that drug debt in
turn and began dealing directly with Morfin for the supply of
drugs.  (Tr. 48.)  Agent Crosby testified that ultimately
Carrera's relationship with Morfin soured, and Carrera needed to
find alternative sources for his methamphetamine, which
ultimately led to his relationship with Segura and Valencia.
(Tr. 49.)  Carrera's relationship with Segura and Valencia ended
when Morfin shot Carrera on November 13, 2005.  (Tr. 34, 49.)

Agent Crosby's testimony reveals that although Carrera's
supplier of drugs changed around the end of October 2005, much of
the network remained fairly intact.  For example, Agent Crosby
testified that Robles was involved with Carrera's trafficking
operation "between August of 2005 and November of 2005."  (Tr.
39.)  According to Agent Crosby's testimony, Duell's involvement
with Carrera's drug trafficking started even before August 2005,
and continued into November 2005.  (Tr. 44-47.)  Therefore, at
least some of Carrera's regular buyers continued to buy
methamphetamine from Carrera both when he was obtaining it from
Morphin and when he was obtaining it from Segura and Valencia.
Moreover, it is immaterial that some members of the conspiracy

17

did not know other members of the conspiracy.  In addition, as
set forth in detail above, Agent Crosby's testimony provides
evidence establishing that Segura and Valencia were aware that
they were supplying methamphetamine into a network for
distribution.  Thus, when they started selling methamphetamine to
Carrera, they joined his purpose and conspiracy of distributing
the methamphetamine.  That Carrera had more than one team as a
supplier and more than one purchaser during the relevant time
period does not fracture the conspiracy into two or more
conspiracies.  Also, none of the defendants has offered any proof
of a knowing and intentional termination of his participation in
the ongoing conspiracy prior to his arrest.

Although the court has carefully considered the lapse in
time in the evidence presented between when Morphin and Medina
acted as Carrera's suppliers and when Valencia and Segura acted
as Carrera's suppliers, in light of all the evidence presented,
the court concludes that the government has presented adequate
evidence that the activities of these five defendants constituted
essential and integral steps toward the realization of a
continuing, common, illicit goal, which was the distribution of
methamphetamine.  *See Owens*, 70 F.3d at 1126.  Each of the five
defendants, including Valencia and Duell, knew of the common goal
of distributing methamphetamine and voluntarily contributed to
that goal.  As a result, the court rejects Defendants Valencia
and Duell's arguments and instead concludes that sufficient

evidence has been presented to allow a reasonable jury to conclude beyond a reasonable doubt that a single conspiracy existed in this case.  Consequently, the court rejects Defendants Valencia and Duell's arguments and instead concludes that the evidence presented shows that a single conspiracy to distribute methamphetamine existed from at least March 2005 to November 13, 2005.

### B.   Whether the Declarant and Defendants Were Members of the Conspiracy

The second element the court must consider is whether the declarant and the defendants still involved in this case were members of the conspiracy.  *See Urena*, 27 F.3d at 1490.

The government provided the court and Defendants with a packet of statements it desires to admit into evidence.  The court has already concluded in its analysis above that Agent Crosby's testimony provided adequate evidence that the defendants still involved in this case were members of the conspiracy.  None of the defendants involved in this case has disputed that the statements offered by the government should not be admitted because the declarant and the defendants were not members of the conspiracy.  In addition, the court has reviewed the statements and concludes that the government has shown by a preponderance of the evidence that the declarant and the five defendants at issue were members of the conspiracy.  As a result, the court concludes

that the government also has met the second element of the Rule 801(d)(2)(E).

## FINDINGS AND RECOMMENDATION

Based on the above analysis, the court finds that the government has met, by a preponderance of the evidence, the first two required elements of Rule 801(d)(2)(E) of the Federal Rules of Evidence.

First, Defendants Valencia and Duell argue that the testimony offered at the *James* hearing demonstrated that multiple conspiracies, rather than a single conspiracy existed. However, based on the analysis above, the court finds that the government has presented evidence showing by a preponderance of the evidence that a conspiracy existed. In addition, the court finds that sufficient evidence has been presented to allow a reasonable jury to conclude, beyond a reasonable doubt, that only one conspiracy, rather than multiple conspiracies, existed.

Second, the court finds that the government has established by a preponderance of the evidence that Defendants Eric Angell, Mark Robles, Francisco Valencia, Christopher Duell, and Javier Segura were members of the conspiracy. The court's determination, however, does not limit the conspiracy to only these named individuals.

The third required element of Rule 801(d)(2)(E), whether the statements were made in the course of and in furtherance of the conspiracy, will need to be addressed at trial.

20

Based on the above, **IT IS HEREBY RECOMMENDED THAT THESE FINDINGS BE ADOPTED BY THE COURT.**

Copies of the foregoing report and recommendation are being mailed to the parties who are hereby notified of their right to object to the same.  The parties are further notified that they must file any objections to the report and recommendation, with the clerk of the district court, pursuant to 28 U.S.C. § 636(b), within ten (10) days after receiving it.  Failure to file objections to both factual and legal findings may constitute a waiver of those objections on subsequent appellate review.

DATED this 13th day of July, 2007.

BY THE COURT:

_____
Samuel Alba
United States Chief Magistrate Judge